IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2024

## IN RE TUCKER R. ET AL.

**Appeal from the Juvenile Court for Jefferson County**
**No. 22-00735          Dennis "Will" Roach, II, Judge**

_____

### No. E2023-01591-COA-R3-PT
_____

The Juvenile Court for Jefferson County ("the Juvenile Court") terminated the parental rights of Meliah B. ("Mother") to her children, Tucker R., Gracelynn R., and Roland R. ("the Children"). Mother has appealed, challenging only the Juvenile Court's finding that termination of her parental rights was in the Children's best interest. Finding no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Matthew Lorah, Knoxville, Tennessee, for the appellant, Meliah B.

Mindy Norton Seals, Morristown, Tennessee, Guardian *ad litem*.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

## OPINION

## Background

In September 2021, the Tennessee Department of Children's Services ("DCS") filed a petition to adjudicate the Children dependent and neglected by Mother and Gregory R. ("Father")[1] in the Juvenile Court. DCS alleged the following:

1. On September 17, 2021, local law enforcement responded to the family residence due to Scott [L.], Mother's paramour, overdosing in the home. Law enforcement requested immediate assistance from DCS due to the situation at the home.

2. CM Ramsey responded to the request for assistance. Mr. [L.] was still in the residence upon her arrival. There were needles and heroin found in his room.

3. Mother admitted to methamphetamine, ecstasy, and Suboxone use on September 16, 2021. Mother admitted that she has used marijuana one week prior. Law enforcement found a methamphetamine pipe, marijuana pipe, and baggies of methamphetamine in Mother's room - this is the also the room in which the children were located. They also found more pipes and marijuana seeds hidden in a desk and Mother admitted to selling.

4. Mother submitted to a urine drug screen and tested positive for methamphetamine, amphetamine, benzodiazepine buprenorphine, ecstasy, and THC, for none of which did she have a prescription.

5. Mother reported that she used drugs while the children were asleep in the home. Mother admitted to knowing that Mr. [L.] was using heroin, but she had told him not to do it at her house.

6. Another adult female, Amanda [S.], was found in the home. She admitted to using methamphetamine at approximately 7:00 a.m. this morning by both intravenous injection and smoking.

7. CM Ramsey found the two-year-old in a crib with a baby gate strapped to the top, creating a cage. Mother reported that she did not want the child to be around in the house because she "does not know what is in her house."

_____

[1] Father is not a party to this appeal and our focus is, therefore, limited to Mother.

8.  The home was cluttered.  As noted earlier, there were several pipes and baggies of methamphetamine found in the home. In addition, there was a knife and ashtray within reach of the children and the home was cluttered with clothes and dishes.

9.  **Based on these facts, the children are victims of severe abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(27).**

10.  Father is currently incarcerated in the Jefferson County Jail.

11.  CM Ramsey spoke with Tucker at his school.  Tucker reported that []he sometimes has to care for the children while Mother works at night or in the morning.  Tucker told CM Ramsey that he gets in trouble at school because his Mother does not give him his medication; he admitted that sometimes he will find the medicine and take it himself.  Tucker reported that he has never seen anyone using drugs in the home.

12.  When CM Ramsey attempted to visit Adam[2] at school, he was not there.  Mother reported that they are going to run with Adam.  The grandfather and grandmother reported that grandfather and Adam were going to stay at the Rod Run in Sevierville this weekend.  Grandfather attempted to say that they have partial custody, but they only have a Power of Attorney from Mother.  Grandfather refuses to return the child to DCS.

DCS requested that the Juvenile Court place the Children in the temporary care and custody of DCS.  At the time DCS filed its dependency and neglect petition, Tucker was six years old, Gracelynn was two years old, and Roland was one year old.

The Juvenile Court entered a protective custody order placing the Children in DCS's temporary legal custody.  The Juvenile Court found that DCS had made reasonable efforts to prevent the Children's removal from the home and that it was reasonable to make no effort to maintain the Children in Mother's home given the circumstances.  Mother was granted supervised visitation.  Mother waived the preliminary hearing and stipulated to probable cause of dependency and neglect.

In October 2021, the Juvenile Court entered an order adjudicating the Children dependent and neglected by Mother.  Mother stipulated to "clear and convincing evidence of dependency and neglect based on allegations in petition."  The Juvenile Court further found that Mother had committed severe child abuse against the Children, pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(F), noting that at least two of the

---

[2] Adam B. is Mother's oldest child from a prior relationship.  Adam was not subject to the termination proceedings in the Juvenile Court and is only referenced herein for context.

Children had tested positive for methamphetamine and amphetamines. The order reflected that Mother had agreed to enter "Safe Baby Court." In December 2022, the Juvenile Court appointed Mindy Seals as guardian *ad litem* ("GAL") and appointed Mother an attorney.

On December 5, 2022, DCS filed a petition to terminate Mother's parental rights to the Children. DCS alleged two grounds for termination: (1) persistence of conditions, pursuant to Tenn. Code Ann. § 36-1-113(g)(3), and (2) severe child abuse, pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and § 37-1-102(b)(27). DCS further alleged that termination of Mother's parental rights was in the Children's best interest, pursuant to Tenn. Code Ann. 36-1-113(i).

Trial on the termination petition was in July 2023. The Juvenile Court heard testimony from Mother; the Children's foster mother, Samantha A. ("Foster Mother"); and DCS case managers, Jessica Eslinger ("Eslinger") and Jessica Boone ("Boone").

Eslinger testified that she was the DCS case manager for the Children from November 2021 until June 2023, with a brief absence between January and February 2023. Eslinger affirmed that the Children had been in Mother's care and custody when they were removed to DCS custody and that hair follicle tests revealed that Tucker and Gracelynn had been exposed to methamphetamine and amphetamines. Eslinger testified that the main issue preventing the Children from returning to Mother's custody was Mother's continued substance abuse. According to Eslinger, Mother completed two alcohol and drug assessments and an inpatient drug rehabilitation program in May 2022 but failed to follow up with intensive out-patient therapy, referred to as "IOP" throughout the record. Eslinger testified that Mother relapsed and tested positive for illicit substances repeatedly.

According to Eslinger, Mother tested positive for methamphetamine and amphetamines in June 2022; failed a drug screen in July 2022; tested positive for methamphetamine in August 2022; tested positive for methamphetamine, amphetamines, and other illicit substances in September 2022; and tested positive for methamphetamine and amphetamines in April 2023. Mother did not comply with hair follicle requests in February or June of 2023. Eslinger indicated that Mother had passed only one drug screen.

With respect to Mother's support and visitation, Eslinger testified that Mother consistently paid child support and visited the Children approximately once per month. However, Mother's visits often had to be canceled because she failed to confirm those visits in advance. Some visits were cancelled due to Mother's failed drug screens. After one visit was cancelled due to Mother's failure to confirm, Mother threatened to "bust" Eslinger in the face and "continued to text" Eslinger for three days, stating that Eslinger was a "crap person" and that she hoped Eslinger had a "horrible day." Screenshots of

text conversations between Eslinger and Mother were entered into evidence, revealing the threatening and expletive-laden nature of Mother's messages. Eslinger was removed from the case in June 2023 as a result of Mother's behavior.

Eslinger testified that the Children had been in the same foster home since their removal to DCS custody in September 2021 and that they had bonded with their foster parents, Foster Mother and Brandon A. ("Foster Father") (collectively, "Foster Parents"). However, Eslinger also explained that Mother still had a relationship with the Children, that the Children still refer to Mother as mom, that the Children have cried when visits with Mother are over, and that they have asked to go home with Mother after a few of the visits.

Still, Eslinger testified that changing caregivers would have a detrimental effect on the Children and that the Children would not be adversely affected if Mother's parental rights were terminated. When asked for the basis of her conclusion, Eslinger reasoned that the Children do not ask about Mother outside of visits and that they refer to Foster Parents as mom and dad.

Foster Mother testified that the Children have lived continuously with Foster Father and her since September 2021. She stated that Foster Father and she love the Children very much and would like to adopt them. She further testified that Gracelynn and Roland refer to them as "mommy and daddy" and that Tucker calls them "mom and dad." According to Foster Mother, the Children have developed bonds with her mother-in-law, who lives close by and sees them two to three times per week. The Children have also developed bonds with Foster Mother's mother, step-father, grandparents, and sister. The Children live in the foster home with Foster Parents' four adopted children. Foster Mother testified that Gracelynn is best friends with their adopted daughter.

When Tucker first arrived in Foster Parents' home, he exhibited behavioral issues and Foster Parents and his primary care physician determined which ADHD medication worked best for him through trial and error. Tucker also was evaluated at "Camelot"[3] due to his behavioral issues and his need for "general trauma therapy." Camelot recommended out-patient therapy to Tucker for "depression, anxiety, witnessing domestic violence." When asked about Tucker's emotional well-being, Foster Mother explained that "[r]ight now he just kind of has a lot of questions because he's just unsure of . . . what's happened" but that "for the most part his wellbeing is pretty good." Foster Mother testified that Tucker continues to receive "trauma-focused therapy" at Camelot.

---

[3] Although "Camelot" is not clearly defined, documentation in the record demonstrates that Camelot is the organization that conducted Tucker's mental health assessment. Camelot evidently is a mental health provider.

Regarding Gracelynn, Foster Mother testified that she had to receive Tennessee Early Intervention Services ("TEIS") and occupational therapy because she had "a really hard time with transition and meeting people was really hard for her." Foster Mother described Gracelynn as "very closed off" and testified that her demeanor was "afraid of anybody and everybody" when she first arrived in their home. However, as of the day of trial, Foster Mother described Gracelynn as "very happy, upbeat." By the time of trial, Gracelynn had completed TEIS and occupational therapy.

In terms of the Children's relationship with Mother, Foster Mother acknowledged that the Children still retain a bond with Mother. Foster Mother testified that the Children have occasionally cried when Mother leaves visits and that they sometimes say that they miss Mother. According to Foster Mother, Tucker sometimes will ask about Mother's whereabouts and her work. However, when asked whether the Children ask for Mother outside of visits "like if they were to get injured or something," Foster Mother responded, "No." Foster Mother also testified that Tucker sometimes asks about his older brother, Adam, and she affirmed that if Mother's parental rights were terminated, Tucker would still have a relationship with Adam.

During her testimony, Mother affirmed that she has been "an addict" since she was a teenager and that her longest period of sobriety during the last two years was three months. When asked how many times she had "attended rehab," Mother answered: "I went to in-patient and then I did Zoom IOP for a couple of weeks and I did IOP at New Hope and now I'm in IOP at Cornerstone." She claimed that she had been unable to complete the first two intensive out-patient therapy programs due to her work schedule and that she started intensive out-patient therapy at Cornerstone a week prior to trial. Mother testified that she had completed an anger management class, domestic violence class, and parenting class.

Mother testified that the last time she used methamphetamine was approximately two months prior to trial. She later stated that she had been sober close to three months prior to trial. When asked whether she believed she had "given it" her "all," Mother acknowledged that she had not.

Despite being sober for not even three months, Mother believed the Children could safely return to her home that day. Mother attributed her inability to stay sober to her Children's absence from her life, explaining: "I miss them. And it's hard for me to stay clean when I'm a hurting. . . . They're all I have." As did Eslinger and Foster Mother, Mother testified that she still had a bond with the Children.

The Juvenile Court entered a final judgment terminating Mother's parental rights to the Children on October 11, 2023. The Juvenile Court made the following findings of fact and conclusions of law:

## GROUND II.
## PERSISTENT CONDITIONS
## Tennessee Code Annotated § 36-1-113(g)(3)

In order to meet the requirements of this ground for termination, the Petitioner must show by clear and convincing evidence that there are persistent conditions as to Respondent, [Mother], pursuant to Tenn. Code Ann. § 36-1-113(g)(3) in pertinent part:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

> There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

> The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

5. On September 17, 2021, and upon petition by DCS, this Court ordered that the minor children were to be removed from the house of the Mother. The conditions that led to the removal of the children were the drug use of Mother, and the death of Mother's paramour due to an overdose. In the Severe Abuse Order dated October 27, 2021, Mother stipulated to the facts alleged in the petition of September the 17th. Among other things, Mom stipulated to using drugs and testing positive for a host of drugs, including methamphetamine. Mom also stipulated that a hair follicle test on two of her children had tested positive for methamphetamine and amphetamine.

6. The testimony has shown that Mom has been struggling with addiction since her teenage years. Mother testified she has been enrolled in multiple intensive outpatient programs, but testimony also has shown she has

- 7 -

completed none. Mother testified she has been in rehab multiple times but has been clean no more than 3 months in a row over the past two (2) years. Mother has failed multiple drug screens throughout the custodial period. As late as April of this year (2023) Mother tested positive for Methamphetamine and Amphetamine. Mom is in the midst of what has thus far been an endless cycle of addiction, rehab, and relapse. On the other hand, Mother testified she has now been clean for 2 or 3 months, has a job with FedEx, and lives with her father.

7. It is the opinion of this Court that Mother's battle with addiction is an ongoing and defining issue in her life. Her failure to maintain sobriety for a time period exceeding 3 months (over the last 2 years) is weighty evidence of a continuous inability to provide fundamental care to her children, stretching back at least to the time of removal in September 2021. This condition prevents the safe return of the children to the Mother's care at this point, and would, in all reasonable probability, cause the children to be subjected to further abuse or neglect.

8. After a nearly 2-year custodial episode and multiple failed attempts at maintaining sobriety, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the parent in the near future. To reason otherwise, would, in the opinion of this Court, necessarily subject the children to further lingering in a state of impermanency.

9. In this Court's opinion, as it relates to the window of time Mother had to prove she was capable of consistent sobriety, the window has closed. The continuation of the parent and child relationship in this case greatly diminishes the children's chances of early integration into a safe, stable, and permanent home.

10. For these reasons, the Court finds by clear and convincing evidence the grounds set forth in T.C.A. § 36-1-113(g)(3) have been met, that there are persistent conditions with respect to Respondent [Mother] and there is little likelihood those conditions will soon be remedied and that it would pose a risk to permanency place the children back in her care or custody.

### GROUND III.
### SEVERE CHILD ABUSE
### Tennessee Code Annotated §§ 36-1-113(g)(4) and 37-1-102(b)(27)

In order to meet the requirements of this ground for termination, the Petitioner must show by clear and convincing evidence that Respondent,

[Mother], committed severe child abuse pursuant to <u>Tenn. Code Ann.</u> § 36-1-113(g)(4) and 37-1-102(b)(27) in pertinent part:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;
>
> (D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring; (E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or (F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child: . . . iii) Methamphetamine;

11. As alluded to earlier, Mother stipulated to severe abuse in the Adjudicatory Order of this Court dated September 27, 2021. Two of her minor children tested positive for methamphetamine and amphetamine. This ground has been proven by clear and convincing evidence.

12. For these reasons, the Court finds by clear and convincing evidence the grounds set forth in T.C.A. § 36-1-113(g)(4) and 37-1-102(b)(27) have been met, that Respondent [Mother] did commit severe abuse.

**BEST INTEREST**
**<u>Tennessee Code Annotated § 36-1-113(i)</u>**

\* \* \*

13. The children in this case need stability and continuity of placement. They have had that stability and continuity for almost 2 years in the home of their current, preadoptive placement. The children are well-adapted, loved, safe, and thriving in their current placement. They are involved in extra-curricular activities, and have developed deep and enduring relationships with their foster parents, with other children in the home, and with relatives of their caregivers. To uproot the children at this point would most likely cause a severe upheaval in the lives of the children.

14. As evidenced by her series of failed attempts at sobriety, Mother has been unable to demonstrate continued stability in meeting the needs of her children. Mother does have a parental attachment to the kids, and the kids do enjoy seeing Mother, but this court cannot conclude that the relationship is either secure or healthy. The kids do not ask about Mother after visits, and call both Mother and their foster mom "Mom." Mother has visited the kids somewhat regularly, excepting the months where her visits were cancelled due to failed drug screens, and the children do not appear to be fearful of being with Mother. However, Tucker [R.] is currently undergoing trauma-focused treatment due to what he witnessed in the home of the Mother.

15. Although Mother has attempted on multiple occasions to take advantage of services offered to her by DCS, she admittedly stated she hasn't tried hard enough, and has failed to exhibit a sense of urgency. She has yet to complete an IOP, and has relapsed during the pendency of the custodial episode, failing multiple drug tests. By providing opportunities for IOP treatment, rehabilitation, and various assessments, DCS has made reasonable efforts to assist the Mother.

16. In the Mother's favor, she now lives with her supportive father, and has made consistent support payments, both in cash and gifts, but in light of the reasons for the removal and the history of drug use, this Court cannot conclude Mother has the ability to maintain a home that meets the needs of her children - primarily the need for her continued sobriety.

17. The Court's best interests analysis leans heavily on the proof that Mother's last drug screen, an oral screen in April of this year, was positive for Amphetamine and Methamphetamine. Furthermore, DCS requested a hair follicle in February, April, and June of this year: none of which have been completed by Mother. A statement by Mother that she is 2-3 months sober, when viewed in light of her refusal to submit to a hair follicle test as requested by DCS, and coupled with her failed oral swab on April the 17th, leaves this Court incredulous as to Mother's claim of sobriety. The Court is thus forced to look back to Mother's last test in April as a weightier basis for judgment as to Mom's sobriety.

18. Even if this Court were to assume as true Mother's claim of sobriety over the past 3 months, when paired with her failed drug screens during the pendency of this case, her refusal to submit to a hair follicle test in 2023, and her admitted inability to maintain sobriety for longer than 3 months, the Court is left with little reasonable likelihood to believe Mother's situation has changed in a lasting way, or will change in such a way as to provide the

children the safety, security, and stability they deserve in a reasonable time. In essence, Mother is asking the Court to believe she can do something she has admittedly been unable to do for at least 2 years. Meanwhile, the children grow, thrive, and form healthy bonds with multiple members of the immediate and extended family of the pre-adoptive foster parents. In conclusion, by clear and convincing evidence, it is in the best interests of the children that the parental rights of the Mother be terminated.

Mother timely appealed.

## Discussion

Although not stated exactly as such, Mother raises only one issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights was in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

- 11 -

consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

- 12 -

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings."

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[6] Tenn. Code Ann. § 36-1-113(i).

*Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge either of the grounds found against her, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we must review the grounds found against Mother even though she does not dispute them.

On December 5, 2022, at the time the termination petition was filed, the relevant statutory grounds for termination read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or

- 14 -

omissions in one ground does not prevent them from coming within another ground:

* * *

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2022 to May 4, 2023). The definition of "severe child abuse" relevant to this case reads as follows:

(27) "Severe child abuse" means:

* * *

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

- 15 -

(E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or

(F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child: . . . (iii) Methamphetamine[.]

Tenn. Code Ann. § 37-1-102(b)(27) (West July 1, 2022 to May 4, 2023).

The Juvenile Court found that DCS proved this ground by clear and convincing evidence based upon its October 27, 2021[7] adjudicatory order finding that Mother had committed severe child abuse against the Children, pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(F). There is no indication in the record that Mother ever appealed the adjudicatory order or that it is nonfinal. Mother did not claim otherwise at trial, nor does she do so on appeal.

Although the Juvenile Court's adjudicatory order finds severe child abuse based solely upon subsection (F), the Juvenile Court also referenced subsections (D) and (E) in its final judgment. Despite its reference to subsections (D) and (E), it is unclear whether the Juvenile Court found that these subsections also served as a basis for this ground. Nevertheless, evidence that Mother committed severe child abuse as defined under subsection (F) is sufficient to establish this ground for termination, and we accordingly affirm the Juvenile Court's finding of this ground, as established by clear and convincing evidence.

The additional ground found by the Juvenile Court was persistence of conditions. As instructed by *In re Carrington H.*, we have likewise reviewed the Juvenile Court's findings as to this additional ground as found by the Juvenile Court. The evidence does not preponderate against the Juvenile Court's findings relevant to persistence of conditions. The ground of persistence of conditions was also proven by clear and convincing evidence, and we affirm the Juvenile Court's judgment as to this ground.

We next address whether the Juvenile Court erred in finding that termination of Mother's parental rights was in the Children's best interest. When DCS filed its termination petition, the statutory best interest factors read as follows:

---

[7] Although the Juvenile Court's findings referenced an adjudicatory order dated September 27, 2021, the adjudicatory order is dated October 27, 2021. The Juvenile Court's mistaken date amounts to harmless error.

- 16 -

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the

circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors[8] listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d [507] at 523 [(Tenn. 2016)] (citing *In re Audrey S*., 182 S.W.3d 838, 878

---

[8] Although there are now twenty best interest factors instead of nine, our Supreme Court's instruction in *In re Gabriella D.*, 531 S.W.3d 662 (Tenn. 2017) still applies.

(Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  *In re Kaliyah S.*, 455 S.W.3d [533] at 555 [(Tenn. 2015)] (citing *In re Audrey S.*, 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  *Id.*  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  *In re Audrey S.*, 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  *Id.*  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case.  *See In re Audrey S.*, 182 S.W.3d at 878.  Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.  *In re Carrington H.*, 483 S.W.3d at 523.  "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."  *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Mother primarily argues that the Juvenile Court should have assigned more weight to her relationship and bond with the Children.  Although this Court has indicated that "in some cases the lack of a meaningful relationship between a parent and child is the most important factor" and that "it is not error for a trial court to place similar weight on the fact that such a relationship exists," *In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018), the evidence of a meaningful relationship between the Children and Mother in this case was not so strong as to militate against the numerous other factors weighing in favor of termination of Mother's parental rights.

Although the evidence indicated that the Children have some degree of attachment to Mother, Mother visited the Children only once per month on average. Often visits had to be cancelled due to Mother's failure to confirm with DCS that she could attend scheduled visits or her failure to pass a drug screen. Foster Mother testified that Tucker sometimes would ask where Mother was and what she did for work, but both Foster Mother and Eslinger indicated that the Children generally do not ask about Mother outside of visits. In addition, the Children referred to Foster Parents as mom and dad, and Foster Parents have filled the role of their parents when Mother was unable to do so for nearly two years. For these reasons, the Juvenile Court found that, although Mother and the Children have a parental attachment, it could not conclude that the relationship was healthy or secure. Furthermore, many of the other best interest factors weigh heavily against whatever degree of attachment remains between the Children and Mother.

Although the Juvenile Court did not identify each factor by letter which would have assisted this Court's review, it clearly considered the relevant factors, and the evidence does not preponderate against the Juvenile Court's findings related to the Children's best interest. The Juvenile Court made findings related to the following relevant factors: (A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (L), (M), (Q), and (S). As the Juvenile Court found, the Children's need for stability and continuity are being met by Foster Parents, who have provided the Children with a stable home for nearly two years. The Children have bonded with Foster Parents, their children, and extended family, and have adapted well to their foster home. In contrast, Mother failed to maintain sobriety for a significant period of time, despite her efforts, and cannot be expected to provide the Children with stability anytime soon.

Although she completed an inpatient drug rehabilitation program, Mother did not follow up with intensive out-patient therapy as recommended in both alcohol and drug assessments and has been unable to maintain sobriety any longer than a period of three months during the two-year custodial period. Her most recent drug screen administered three months prior to trial revealed that Mother had used methamphetamine and amphetamines. We further note that the Juvenile Court understandably doubted Mother's claim of three months' sobriety, given that she had failed to comply with a requested drug screen one month prior to trial. The Juvenile Court was "incredulous as to Mother's claim of sobriety." Despite the recency and fragility of her sobriety, Mother believed that the Children could safely be returned to her custody on the day of trial, demonstrating her loose grasp on the gravity of her addiction.

Mother candidly acknowledged that she had not given it her all, and the Juvenile Court rightly found that she had not exhibited a sense of urgency in addressing her drug addiction and that Mother would be unable to provide the Children with the safety, security, and stability they deserve within a reasonable timeframe. While we acknowledge that "[r]ecovery from addiction will frequently entail 'false starts and set backs, as well as successes and, regrettably, backsliding,'" *In re Joshua S.*, No. E2010-

01331-COA-R3-PT, 2011 WL 2464720, at \*12 (Tenn. Ct. App. June 16, 2011) (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at \*11 (Tenn. Ct. App. Apr. 14, 2005)), the focus of the best interest analysis is on the child's perspective rather than the parent's, and we are unable to say that Mother did all she could to address her drug addiction. *See In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Despite taking some positive steps, Mother's failure to complete intensive out-patient therapy demonstrates that she had not done all she could to tackle this major obstacle to regaining custody of the Children. Given that Mother has been able to achieve at most only three months of sobriety, if that, over the course of nearly two years, we are unable to say that the Juvenile Court incorrectly determined that termination of Mother's parental rights was in the Children's best interest. The Juvenile Court's best interest determination was supported by clear and convincing evidence.

## Conclusion

For the foregoing reasons, we affirm the Juvenile Court's judgment terminating Mother's parental rights to the Children. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Meliah B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE